IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Case No. 5:24-cr-2 |
| WILLY ALEXANDER KORTHALS, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

**<u>Willy A. Korthals's Sentencing Position</u>**

*If you never heal from what hurt you, you'll bleed on people who didn't cut you.*

Tamar Kulish

**<u>Introduction</u>**

The story of this offense began in 1997 when two teenage foster children living with Willy Korthals's paternal grandmother began sexually abusing him. The foster children abused Willy from approximately six to eleven years old. ECF 37, ¶38. Willy did not understand or appreciate the significance of the abuse at such a young age. <u>Id.</u> ███

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

Willy believed he could run from his problems. Instead of facing the feelings caused by his own abuse, he threw himself into sports (mainly football and wrestling), military service, and, later, his family, to distract himself from his own hurt. Running away from this problem only made things worse for Willy. Because he could not heal, he engaged in behaviors that hurt or would have hurt others to make sense of what happened to him.

Willy will appear before the Court on Monday, June 24 in federal custody. On January 30, 2024, Willy pleaded guilty to attempting to transfer obscene material to a minor, 18 U.S.C. § 1470. Willy will have been in custody for 361 days (almost 12 months) when he appears for sentencing. A time served sentence is "sufficient, but not greater than necessary" to accomplish the goals of sentencing, including punishing Mr. Korthals. 18 U.S.C. § 3553(a). A time served sentence is reasonable given: 1) the sentencing guidelines; 2) Mr. Korthals's history and characteristics, including the abuse he suffered as a child and his circumstances at the time of the offense; 3) his sincere acceptance of responsibility; and 4) the need for treatment in lieu of incarceration.

Following his release from incarceration, Willy will serve a term of supervised release up to 3 years and will be required to register as a sex offender for at least 15 years. Transfer of obscene material to a minor, 18 U.S.C. § 1470, is a Class C felony, so the guideline range for a term of supervised release is 1 year to 3 years. ECF 37, ¶54. Additionally, under the Sex Offender Registration and Notification Act (SORNA), Mr.

Korthals will be a Tier I sex offender. 34 U.S.C. § 20911(2). Therefore, he will be required to register as a sex offender for a period of 15 years. 34 U.S.C. § 20915(a)(1). This additional "punishment" or protection will accomplish the goals of sentencing better than any additional period of incarceration. Healing, not harming Willy by sentencing him to years in prison, will best accomplish the goals of sentencing.

### Applicable Guideline and Requested Sentence

The sentencing guidelines in this case recommend a sentence between 14 and 21 months and a period of supervised release between 1 and 3 years. A 12-month sentence is close to the bottom of the sentencing guideline range. Upon release from incarceration, Willy will return to Michigan to live with his immediate family. His mother, stepfather, and his brothers live in Bay City, Michigan, where Willy grew up. If the Court releases Willy, he will be able to engage in sex offender specific treatment quickly. Defense counsel already identified a program working with the the United States Probation Office (USPO) in Bay City, Michigan.

Berghuis Psychological Services provides outpatient sex offense treatment. Defense counsel spoke to Dr. David Berghuis, who advised that the USPO refers new patients promptly – typically within a few days of release. Following an initial evaluation, new patients begin treatment in a couple weeks. Most patients engage in group treatment weekly and individual treatment one to two times a month. Their curriculum is built around the book <u>Building a Better Life</u> by Pamela Yates and David Prescott.

## Argument in Support of Time-Served Sentence

To determine the appropriate sentence, the Court must consider the applicable sentencing factors in 18 U.S.C. § 3553(a), including the nature and circumstances of the offense, the defendant's history and characteristics, the need for the sentence imposed, the sentencing guidelines, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(1), (2), (4), and (6).

## I.   The nature and circumstances of the offense support a time served sentence.

The nature and circumstances of the offense support a time served sentence. Mr. Korthals attempted to transfer a photograph of his genitals to a person he believed to be a nine-year-old. The offense is serious, but, ultimately, rooted in Mr. Korthals's own experience as a victim of child sexual abuse. Indeed, when he first engaged with the FBI agent on Kik, the FBI agent claimed that he had been abused by his father. ("I was taught the ways at 5 by my dad and passed them on to her." USAO, "Kik chat report," p. 3) Unbeknownst to the FBI Agent, two foster children living with Willy's paternal grandmother sexually abused him when he was about six years old. The abuse lasted until he was about eleven years old. In other words, Willy, too, had been "taught the ways." ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████. The cycle of abuse is not made better by

an enormous prison sentence.

Importantly, Willy did not commit a contact offense. He admits that he discussed meeting up with the FBI Agent more than once and even planned to meet in August 2022. In advance of that visit, Willy sent the results of a sexually transmitted disease test. He also told the FBI Agent his employer required annual STD tests. Online Mr. Korthals fantasized about meeting the FBI Agent, but he never did. He cancelled the August 2022 meeting and ceased communication with the FBI Agent for almost 10 months, when he reached out in June 2023.

Mr. Korthals experience with child sexual abuse material is not "advanced" as the government suggests. Mr. Korthals is forthcoming in his messages with the FBI Agent, but, interestingly, he does not know what "cp" (child pornography) stands for and in May 2022 denies viewing child pornography. USAO, "Kik chat report," p. 34. Mr. Korthals has never talked to another minor (or fictitious minor) sexually and never engaged in sexual activity with a minor as an adult. USAO, "Non-Custodial Interview of Willy."

The FBI arrested Mr. Korthals the day after he sent the obscene photograph to the fictitious minor. Mr. Korthals told his counsel and the FBI that he immediately regretted sending the photograph. He told his counsel that he attempted to switch his phone to "airplane mode" before the photograph "delivered," to stop its transmission to the "minor." When arrested, he admitted to sending the picture and told law enforcement he

"regrets sending it," and "repeatedly said that he was sorry for everything and that he lacked judgment and regretted everything." USAO, "Non-Custodial Interview of Willy." Mr. Korthals's immediate remorse weighs in favor of a 12-month sentence.

Mr. Korthals committed the offense via phone. People commonly engage in sexual fantasy, even revolting sexual fantasy. It is normal to have sexual fantasies that you would not act upon. The internet has made it easier to engage in these kinds of fantasies with others through messaging. The messages in this case, though disturbing, are often imaginative and hypothetical. The intrusive fantasy in this case is rooted in something much deeper and more challenging than the average deviant fantasy (sadomasochism, cuckolding, orgy, etc.), but the point remains – just because someone engages in fantastic conversation does not mean they intend to act it out. See Wahl, David W., "Why People Have Sexual Fantasies They'd Never Act Out," *Psychology Today*, Nov. 5, 2021, https://www.psychologytoday.com/us/blog/sexual-self/202111/why-people-have-sexual-fantasies-theyd-never-act-out, Last Accessed June 18, 2024.

As an adult, Mr. Korthals never engaged in a contact offense with a minor. During his conversation with the FBI agent, the fictitious father asked Mr. Korthals if he had "ever been lucky with young before" and Mr. Korthals wrote that he had sexual contact with his six-year-old cousin when he was a teenager. This is corroborated by a report made by his cousin in 2020. The report alleged that Willy had sexual contact with his younger cousin during the summers of 2006 and 2007. GOV_000001-000002. She would

have been six and he would have been twelve. They were both children. And twelve-year-old Willy had recently been sexually abused by the two foster children for at least five years. The cycle is alarming. However, the Court should not punish Mr. Korthals more harshly because of upsetting actions from his childhood committed on the heels of years of sexual abuse by two much older boys.

In a third-party call with his cousin in 2020, Mr. Korthals apologized, but said he didn't remember much because he "tried blocking it out." In 2020, he also told his cousin about his own abuse – "When I was younger, something happened to me. I guess what I'm trying to say is I really didn't know the difference. I didn't have the talk with my mom or dad yet. All I knew I what happened to me." And "I was pretty much doing what was done to me. I didn't know the difference." GOV_000003. The Court should not treat Mr. Korthals as a repeat offender with a "history of hands-on sex offenses against a child," because of what happened between him and S.S. when they were both children. If anything, this part of the story shows what can, but does not always, happen when a child is subject to sexual abuse.

Even if Willy had been convicted as an adult for this "offense" **and** received a sentence of imprisonment exceeding one year and one month, and the offense were scored, the applicable guidelines for the instant offense would be 18 to 24 months. USSG §4A1.2(d). Considering these hypothetical guidelines, the government's request for an 84-month sentence is extreme and unreasonable.

As a final thought relevant to the circumstances of the offense and the guidelines – the use of a computer enhancement inflates the sentencing guidelines for this offense. USSG § 2G3.1(b)(3) adds two points to the defendant's offense score if the offense involved the use of a computer. Since the inclusion of that specific offense characteristic, technology – and our dependence on it – has changed.

Here, Mr. Korthals communicated with the FBI Agent on Kik, a social media platform. Computers (specifically phones) are so widely used that it is difficult to imagine an offense in this category that would not involve the use of a computer. Consider the following statistic relevant to a similar category of offense – in 1994 and 1995, the government prosecuted a total of 90 defendants convicted of possessing, receiving, or distributing child pornography, and only 24% used a computer. <u>See</u> U.S. Sent'g. Comm'n, *Report to Congress: Sex Crimes Against Children* 29 (1996). In contrast, in 2011, the government prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, and 97.4% used a computer. U.S. Sent'g. Comm'n. *Use of Guidelines and Specific Offense Characteristics* (2011); U.S. Sent'g Comm'n, 2011 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS, tbl. 17. The percentage of offenders who receive this in enhancement is likely greater today. In this way, USSG § 2G1.3(b)(3)(A) no longer serves its purpose – it fails to differentiate among offenders based on their culpability. Therefore, the Court should consider what the sentencing guidelines would be if the use of computer enhancement did not apply. If the use of a computer

enhancement did not apply in this case, the offense score would be 13 and the applicable guidelines for a person with a criminal history category I would be 12 to 18 months. Considering this range, a 12-month sentence is even more appropriate.

Defense counsel and, more importantly, Mr. Korthals understand how serious this offense is. He promptly accepted responsibility for sending the obscene photograph and his conversations and negotiated a quick guilty plea, admitting to behavior uncorroborated by the discovery he received (but which he agreed to be true) because he understands how serious the conduct is and wants help.

II.     **Mr. Korthals's history and characteristics support a time served sentence.**

A 12-month sentence is appropriate considering Willy Korthals's history and characteristics. Willy is a victim of child sexual abuse. Willy did his best to keep his abuse a secret. Willy still has difficulty talking about what happened to him. He shared that he was being abused by one of the foster children the night his youngest brother, Daniel, was born. He remembers his grandmother shouting the news to him and the teenager from the top of the basement steps. Mr. Korthals believes that part of him thought that if he did not acknowledge his own abuse, he could forget about that it happened and move forward. Forgetting proved too difficult, especially for a child routinely abused for more than five years.

When the abuse ended, Willy imitated what had been done to him with his younger cousin. As discussed above, this uncharged conduct should not be considered

aggravating by the Court. Willy was still a child when the conduct occurred and affected by the PTSD caused by his own abuse – *If you never heal from what hurt you, you'll bleed on people who didn't cut you.* Mr. Korthals abuse is corroborated by his 2020 statement to his cousin, the letters written by his family, and his statement upon his arrest (USAO, "Non-Custodial Interview of Willy.").

Willy tried to move forward when he became an adult. He joined the United States Marine Corps (USMC) before he graduated high school. He was seventeen years old. He left for boot camp on June 21, 2012 – shortly after he graduated high school. He completed "boot camp" at Camp Pendleton in California, then traveled to Fort Lee in Virginia for three months. In 2013, he was stationed at Camp Hanson in Japan for three years. After his deployment he returned to Camp Pendleton in California for three years, then transferred to Camp Lejeuene for his final three years in the service.



Mr. Korthals military service was exemplary. He was an artillery mechanic. At one time he was chief of the largest artillery repair shop in California. His job involved tremendous risk, including repairing tanks with live rounds in them. He spent considerable time in the field, exposed to constant artillery fire. Willy received three Good Conduct Medals during his service. Good Conduct Medals are awarded every three years. Unfortunately, following his arrest, his current wife cut him and his family off and he has been unable to retrieve any of his Marine Corps memorabilia from her. During his military service, Willy married Jessica Damron. That relationship caused considerable stress and they divorced in 2020. She had a series of miscarriages and almost died during emergency ovarian surgery. After that, their relationship deteriorated, and they eventually decided to part ways.

Willy served in the USMC for ten years. His departure from the military in 2022 and significant stressors at home led to increased feelings of anxiety and depression. Child sexual assault survivors often experience post-traumatic stress disorder, anxiety, low self-esteem, thoughts of suicide, and, most relevant here, depression.[1] Willy believes he experienced depression throughout his childhood and twenties. He remembers attending therapy in high school to help cope with his grandmother's death. He did not tell his therapist then about the sexual abuse. Willy's mental health worsened when he

---

[1] *See, e.g.*, Julia Whealin & Erin Barnett, *Child Sexual Abuse*, U.S. Dep't of Veterans Affs., https://www.ptsd.va.gov/professional/treat/type/sexual_abuse_child.asp (last visited Apr. 7, 2024).

married for the second time and became a father. He felt ill equipped to handle the responsibility, often asking himself, "What am I doing? I'm married and I have a baby!"

Willy married Makenna Korthals in 2020. Willy and Makenna have one child, P.K., born February 18, 2022. Mr. Korthals is devoted to his son. The most painful consequence of his arrest has been his separation from P.K. Willy and Makenna cared for each other, but, after P.K. was born, they argued more, and found less time to be a family. They lived in a trailer together and, that spring, their washing machine broke, and they could not afford to repair the machine, so they moved in with Makenna's mother. Though he appreciated the help, Willy living with his mother-in-law proved difficult.



After the birth of his son, Willy felt immense pressure to leave the USMC so that he could take care of his family. He was anticipating new orders and believed he and his family would be moved – possibly overseas – which would leave them without a support system or require him and his family to separate. Recognizing this, he chose to leave the

service. He was honorably discharged on June 22, 2022. Defense counsel sought his military records in January, but their response is delayed. Mr. Korthals's discharge led to an identity crisis. He'd been a Marine since he was seventeen. This transition from solider to civilian proved more difficult than he'd imagined.

To support his young family, Mr. Korthals worked two different jobs. Mr. Korthals worked Monday through Friday for a landscaping company, and he worked as a draw bridge operator every *other* week from 7 p.m. until 7 a.m. seven days a week. During the weeks he worked both jobs, he had forty-five minutes to get from the draw bridge to Woodlawn Landscaping. He had a couple hours in the evening with his family before returning to draw bridge duty. This impossible schedule worsened his mental health.[2] It is well established that stress worsens depression,[3] and several symptoms of depression

---

2  Research shows a correlation between people who work night shifts and people who develop depression. *See generally* Chidiebere Emmanuel Okechukwu et al., *The Relationship Between Working Night Shifts and Depression Among Nurses: A Systematic Review and Meta-Analysis*, 11 Healthcare (Basel) 937 (2023) (finding a significant relationship between working night shifts and the risk of depression in nurses); Peter Angerer et al., *Night Work and the Risk of Depression*, 114 Dtsch. Arztebl Int. 404 (2017) (finding evidence that nighttime shift work increases a risk of depression). Research also demonstrates a correlation between depression and major life transitions. *See generally* Ahmed A. Moustafa et al., *Depression Following Major Life Transitions in Women: A Review and Theory*, 123 Psychol. Rep. 1501 (2020) (finding that depression can occur due to common major life transitions, even transitions perceived as positive); Kenneth S. Kendler, *Causal Relationship Between Stressful Life Events and the Onset of Major Depression*, 156 Am. J. Psychiatry 837 (1999) (concluding that stressful life events have a substantial causal relationship with the onset of episodes of major depression).

3  *E.g.*, Christopher Pittenger & Ronald S. Duman, *Stress, Depression, and Neuroplasticity: A Convergence of Mechanisms*, 33 Neuropsychopharmacology 88 (2008).

are particularly devastating:

- *Impaired Social Relationships* – Research shows that "individuals with more depressive symptoms may experience fewer social interactions because (1) they may elicit rejection from others as they induce a negative mood in their interaction partners and (2) they are likely to receive less reinforcement from the social environment."[4] People with depression are "especially sensitive to the nature of social interactions" and "spend[] less time with people whom they perceived as close."[5]

- *Poor Decision-Making and Self-Destructive Behavior* – People with depression "make qualitatively different decisions, leading many doctors and psychotherapists to suggest to their patients that they should avoid making major life choices while in a depressed state."[6] Indeed, recent studies show that "risky decision-making might be a noteworthy symptom of depression."[7] Therefore, it is unsurprising that depression can cause self-destructive behavior, including engaging in physical fights, risky sexual behavior, and self-harm.[8]

---

4 Timon Elmer & Chirstoph Stadfeld, *Depressive Symptoms Are Associated With Social Isolation in Face-to-Face Interaction Networks*, 10 Sci. Reps. 1444 (2020).

5 Leslie Brown et al., *An Experience-Sampling Study of Depressive Symptoms and Their Social Context*, J. 199 Nervous and Mental Disease 403 (2011).

6 Yan Leykin, *Decision-Making and Depressive Symptomatology*, 35 Cognit Ther Res. 333 (2010).

7 Jiaqi Lu et al., *Risky Deicsion-Making in Major Depressive Disorder: A Three-Level Meta-Analysis*, 24 Int'l J. Clinical and Health Psych. 100417 (2024).

8 Daisy Follett et al., *Reduced Social Risk-Taking in Depression*, 132 J. Psychopathol. Clinical

- *Feelings of Emptiness, Hopelessness, and Loneliness* – People with depression often feel empty, hopeless, lonely, hollow, purposeless, guilty, and worthless.[9] These feelings can arise even if someone is surrounded by a strong support system.

Around this time, Willy converted to Mormonism at his wife's request. He found benefits in this new religious practice, but the dramatic shift and the pressure that came with his new religion added to his identity crisis.

Mr. Korthals will face additional, unique, and deeply personal consequences because of this offense – on top of supervision and registration requirements. Willy has not had contact with Makenna or P.K. since his arrest. Defense counsel was also unable to contact Makenna. He has been completely cut off from his wife and, most importantly, his son. This has caused Willy significant heartache. He knows that it will be difficult to find and reconnect with his son because of this offense. The loss of contact with P.K. reminds Willy why he must get help. A period of incarceration greater than 12-months will make it even more difficult for Willy to reconnect with or provide any support for his son. That is another reason why a 12-month sentence is sufficient, but not greater than

---

Sci. 156 (2023).

9 See Raheel Mushtaq et al., *Relationship Between Loneliness, Psychiatric Disorders and Physical Health? A Review on the Psychological Aspects of Loneliness*, 2014 J. Clinical and Diagnostic Res. 8; *Overview of Depression (Major Depressive Disorder)*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/depression/symptoms-causes/syc-20356007 (last visited Apr. 7, 2024); Alessandra D'Agostino, *The Feeling of Emptiness: A Review of a Complex Subjective Experience*, 28 Harv. Rev. Psychiatry 287 (2020); Evren Erzen & Özkan Çikrikci, *The Effect of Loneliness on Depression: A Meta-Analysis*, 64 Int'l J. Soc. Psychiatry 427 (2018).

necessary.

This offense is intertwined with Mr. Korthals's mental health. He now knows that he needs significant mental health help to recover – and he knows that he cannot run from or forget his past. Mr. Korthals has a strong network of family and friends to support him upon his release. They now know about the abuse he experienced in childhood, and they know about this offense. His mother, stepfather, brothers, and family friends will ensure that he is supported when released and for the rest of his life. Their willingness to support Willy are memorialized in the letters of support. There letters are also a testament to the better moments of Willy's life and the good he has to offer the world.



III.    <u>**A 12-month or time served sentence will accomplish the sentencing goals.**</u>

A 12-month sentence, considering a subsequent period of 1–3 years of supervised

release and registration for 15 years as a sex offender, reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. 18 U.S.C. § 3553(a)(2)(A). The transfer of obscene material to a minor deserves punishment. Given Mr. Korthals's identify crisis and severe depression at the time of the offense, his efforts willingness to face his past and engage in rehabilitation, and the restrictions under which he will live after his period of incarceration, a sentence of 12months is sufficient to reflect the seriousness of the offense. Notably, after he is released from prison, Mr. Korthals will not be allowed to participate as a volunteer in activities that involve contact with minors without the USPO's approval, which will drastically affect his fatherhood; he will likely be required to obtain the USPO's approval before he purchases a computer or cell phone; he will likely participate in a Computer Monitoring Program; and he will not be permitted to reside or loiter within 100 feet of a park, school, playground, park, day care center, zoo, or youth center, along with a whole host of consequences that will dramatically alter his life.

    a.   <u>A 12-month sentence affords adequate deterrence.</u>

A 12-month sentence is sufficient to deter Mr. Korthals from future criminal behavior. 18 U.S.C. § 3553(a)(2)(B). This is Mr. Korthals's first conviction and his first time incarcerated. Twelve months (plus the additional collateral consequences of his behavior and conviction) is a severe punishment, especially considering the years of supervised release and registration as a sex offender that will follow. Mr. Korthals recognizes the

severity of his actions. Because this is Mr. Korthals's first conviction and because he is already aware of the steps that he needs to take to heal so that this does not happen again, he will sufficiently be deterred by a 12-month sentence.

      b.   <u>A 12-month sentence will protect the public from future crimes.</u>

A 12-month sentence will adequately protect the public from future crimes. 18 U.S.C. § 3553(a)(2)(C). This conviction is Mr. Korthals's wake up call. He is a first-time, zero-point offender, and a sentence of 12 months will sufficiently deter him from committing another crime. Additionally, Mr. Korthals will need to register as a sex offender for 15 years. 34 U.S.C. § 20915(a)(1). The conditions under which Mr. Korthals will live as a registered sex offender will adequately protect the public even after Mr. Korthals is released. A 12-month sentence will also give Mr. Korthals access to the best possible sex offender treatment sooner. Treatment in the community is substantially better than treatment while incarcerated at the Bureau of Prisons.

      c.  <u>A 12-month sentence satisfies the need for the sentence to provide needed rehabilitation.</u>

Mr. Korthals needs treatment for PTSD and depression, and he needs to participate in a robust sex offender treatment program in a positive environment. Release will allow him to engage in rehabilitation sooner and treatment will be more meaningful outside of prison. 18 U.S.C. § 3553(a)(2)(D). Additionally, Willy's father has spoken to his employer, a temp agency, and is certain that Willy will be able to secure employment quickly. This work opportunity coupled with sex offender treatment and mental health

therapy in the community will provide Mr. Korthals with the rehabilitation necessary to accomplish the goals of sentencing.

   d.  A 12-month sentence will avoid unwarranted sentencing disparities among similarly situated individuals.

A sentence much higher than 12 months risks creating an unwarranted sentencing disparity among similarly situated individuals. 18 U.S.C. § 3553(a)(6). An 84-month sentence would create an outrageous sentencing disparity. The applicable guidelines for similarly situated defendants convicted of transferring obscene material to a minor are 15 to 21 months. The median sentence imposed for this sentence during the last five fiscal years is 17 months. ECF 37, p. 21. Notably, only 86% of similarly situated defendants received a sentence of incarceration for this offense. A 12-month offense, considering the other sentencing factors, would protect against unwarranted sentencing disparities.

## IV.  Appropriate Conditions of Supervised Release.

Defense counsel objects to proposed Standard Conditions 4 and 10, Special Condition 2, and Sex Offender Conditions 1, 3, 4, 6, 7, 10, 13, 14, 15, and 17 – 19 for the reasons articulated in her objections to the presentence investigation report. ECF 36.

Defense counsel offers the following additional argument in support of her objection to Sex Offender Conditions 6 and 7 -- Defense counsel specifically objects to requiring the Defendant to complete a polygraph exam as a method of "treatment" for the same reasons defense counsel objects to requiring that the Defendant submit to polygraph or any other court approved testing to monitor his compliance while on

supervision. Should the Court decide to impose this condition, defense counsel requests that any polygraphs be administered at the direction of and by a treatment provider – if necessary, not the USPO, and be used only for the purpose of treatment. In <u>United States v. LaMarcus Thomas</u>, 5:16-cr-1, Chief Judge Michael F. Urbanski denied the United States Probation Office's request to use polygraph or other testing to monitor compliance while on supervision. <u>Id.</u>, ECF No. 82, p. 5. Similarly, in <u>United States v. John Taylor Whittington</u>, 5:21-cr-2, Judge Elizabeth K. Dillon ordered Mr. Whittington to submit to polygraph or other testing only "in conjunction with sex offender treatment," after a similar argument was made by defense counsel in that case. <u>Id.</u> ECF No. 63, p. 5. The Court followed suit in <u>United States v. William George Price</u>, 3:22-cr-14 (Judge Moon). Polygraphs and similar testing are unreliable and intrusive, but, if they will be used, should only be used in the context of treatment – not for the purpose of monitoring compliance on supervision.

## <u>Conclusion</u>

In 2022, Mr. Korthals life spiraled. He had a new wife and child; he was forced to end a ten-year career as a Marine to provide for his family; and his family faced considerable financial distress. Leaving the USMC, becoming a father, and converting to Mormonism created an identity crisis that led Mr. Korthals to revisit the worst moments of his childhood. Mr. Korthals struggled with untreated PTSD from child sexual abuse and depression that plunged into a state of loneliness and emptiness during which he

made decisions he deeply regrets. Mr. Korthals understands this does not excuse his crime. However, he hopes it provides context for his behavior.

For the reasons explained above, and to meet the various goals of sentencing set forth in § 3553(a), a sentence of 12 months is sufficient, but not greater than necessary. With this sentence, for Mr. Korthals, the story that began in 1997 will end, and, once released form incarceration, he will be able to heal so that the cycle does not continue.

/s/Abigail M. Thibeault
Abigail M. Thibeault
Assistant Federal Public Defender
Maryland Atty ID 1803010004

Office of the Federal Public Defender
401 E. Market Street, Suite 106
Charlottesville, VA 22902
Ph. (434)220-3388
Fax (434)220-3390
abigail_thibeault@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record.

/s/Abigail M. Thibeault
Assistant Federal Public Defender